## WOODWORTH vs. FULTON et al.

A grant of public lands in San Francisco made by an *American* Alcalde, during the continuance of the war between the United States and Mexico, is void; and the grantee acquires neither title nor *color* of title. An Alcalde had no authority, either from the Mexican or American government, to make grants of public lands, or to convey the lands of private individuals, whether they were natural or artificial persons.

The lands lying within the corporate limits of San Francisco, which had not been granted by the Mexican government, or its officers, previous to the conquest of the country by the American forces, constitute a part of the public domain of the United States, and cannot be transferred, except under the authority of Congress.

The title of the United States to the public domain in California, relates back to the time of the occupation of the country by the American army; and from that period, the Mexican laws in relation to the disposition of public lands ceased to be of force.

A person claiming, under an Alcalde's grant made in 1847, title to a 100 *vara* lot of land in San Francisco, cannot maintain a possessory action or an action of ejectment against a person in actual possession, upon the ground that the Alcalde's grantee went upon the lot, in 1848, to take possession, and drove some stakes, and cleared away some brush for the purpose of erecting a dwelling house, when it appeared that he performed no other acts of ownership either at that time or subsequently.

An Alcalde's grantee is chargeable with knowledge that the Alcalde had no authority to make the grant.

In ejectment, the plaintiff must recover on the strength of his own title, and cannot, in general, found his claim upon the insufficiency of the defendant's title.

Whether an action of ejectment can be sustained on the sole ground of prior possession, when it is shown that the plaintiff has no title; Query ? If it may, the acts to make out the possession must be definite, positive and notorious.

APPEAL from the court of First Instance of the district of San Francisco. The action was brought to recover possession of a portion of a 100 *vara* lot in the city of San Francisco. The defendants were in the actual possession of the lot claimed, having purchased it of a third person for a full consideration, and having erected valuable improvements upon it.

The plaintiff claimed to recover by virtue of a grant from an Alcalde of San Francisco, of which the following is a copy :—

" To Edwin Bryant, Esq., Alcalde of the District of San

" Francisco :—Your petitioner being a citizen of California,
" according to the proclamation of his excellency, Commodore
" R. F. Stockton, and a resident of the town of San Francisco,
" would respectfully solicit for the grant of a title to a lot of
" land, No. 22, containing one hundred *varas* square, in the
" vicinity of the town of San Francisco, the said lot being
" a corner lot, and marked in the plan or map now exhibited
" in your office, now vacant and unoccupied ; upon which he
" intends to erect a dwelling house, according to the rules and
" regulations governing in such cases ; and desires that he may
" be put in possession thereof as soon as your convenience will
" permit.

      (Signed,)     " S. E. WOODWORTH, U. S. Navy.

" Whereas S. E. Woodworth has presented the foregoing
" petition soliciting for the grant of a title to a lot of land in
" the vicinity of the town of San Francisco, containing one
" hundred *varas* square, as therein described ; therefore, I, the
" undersigned Alcalde, do hereby give, grant and convey the
" said lot number twenty-two (22) unto the said S. E. Wood-
" worth, his heirs and assigns forever, subject to the following
" conditions :—

   " First. That the said S. E. Woodworth, his heirs or assigns,
" shall erect or cause to be erected a dwelling house on said
" premises, within one year from the date of these presents.

   " Second. That the said S. E. Woodworth, his heirs and as-
" signs, shall enclose or cause to be enclosed said lot with a suit-
" able fence.

   " Third. And to be subject to all rules and regulations
" governing in such cases.

   " In testimony whereof I have hereunto set my hand and
" subscribed my name as Alcalde, this 15th day of April, A.D.
" 1837.

      (Signed,)     " EDWIN BRYANT, Chief Magistrate."

In addition to this paper the plaintiff relied upon certain acts
of possession which he performed in 1848, and which, he insist-
ed, entitled him to judgment although his title should be held

to be invalid.   These are noticed in the opinion of the court. The cause was argued by

*Edward Norton*, for the plaintiff, who made the following points :—

I. The plaintiff, having the legal paper title, was entitled to the possession.

1. It is a part of the history of this country, of which the court will take notice, that Alcaldes' grants, at least under the Mexican dominion, conveyed a title sufficient to enable the grantee to take, hold, and recover possession of municipal lands. (*Henthorn* v. *Doe*, 1 *Blackford*, 159 ; 1 *Kent's Comm.* 470–473.)

2. The authority of Alcaldes to make such grants continued under the American dominion.

Because, The town lands, being the property of the *pueblo*, did not pass to the United States as part of the public domain and could be legally granted by the town authorities in accordance with the municipal laws of the conquered country, which continued in force until others were substituted. (*Halleck's Report, page* 9 ; *Peachy's Report to Com. Council, March* 5, 1850 ; *Bryant's* "*What I saw in California*," 437–439 ; *Proclamation of General Kearney, Bryant*, 431 ; *The Ordinance of the Town Council.*)   As to the exercise of the power by the town authorities, *see* 1 *Kent's Comm.* 470–473.

And because, If the *pueblo* lands did pass to the United States, the grants have been authorized and sanctioned by the United States. (*Acts of Genl. Kearney and of Alcaldes appointed by him, Bryant*, 437, 439.)

3. Both parties claim under the same source of title, and the plaintiff's grant, being the older, is the better.   (*See recital in Deed to Fulton ; Penrose* v. *Griffith*, 4 *Binn.* 231 ; *Chambers* v. *The People*, 4 *Scammon*, 351 ; *Riddle* v. *Murphy*, 7 *Sergeant and Rawle*, 230.)

4. The grant was lawfully made by American authority to an American citizen, because, at the time, the country was held by

the United States by right of conquest and the treaty confirmed their title and related back to its inception. (*Wheaton's Law of Nations*, 208, 396, 440.)

5. The conditions of the grant were abrogated by the party that imposed them. If not, the title is not divested until re-entry after legal *denouncement*. (*See Ordinance; Case fol.* 8, 9.)

II. The prior possession of the plaintiff was sufficient to authorize him to be restored. (1 *White's Recop.* 87, *cap.* 4; *Escriche's Dic.* 541; *Jackson* v. *Hubble*, 1 *Cowen*, 613; *Whitney* v. *Wright*, 15 *Wend.* 171; *Wheeler* v. *Rogers*, 4 *Hill*, 466; *Carpenter* v. *Weeks*, 2 *Hill*, 341; *New York Reports.—Den* v. *Sinnickson*, 4 *Halstead*, 149; *New Jersey.—Ellithorp* v. *Dening*, 1 *Chipman*, 141; *Vermont.—Hoey* v. *Furman*, 1 *Penn. State Rep.* 295; *Pennsylvania.—Hutchins* v. *Erickson*, 1 *Har. and McHenry*, 339; *Maryland.—Ludlow's Heirs* v. *McBride*, 3 *Ham.* 240; *Ohio.—Jackson* v. *Porter*, *Paine*, 457; *2d Circuit.—Robinson* v. *Doe*, 6 *Blackford*, 85; *Indiana.*)

1. The plaintiff had *actual* possession of the whole lot under claim of title, and adverse to all the world.

The petition and act of taking possession show the good faith. (*Escriche's Dic.* 541; 1 *White's Rec.* 87, 92; 7 *Feb. Tapia*, 33; *Northrop* v. *Wright*, 7 *Hill*, 488; *Jackson* v. *Newton*, 18 *J. R.* 355; *Gardner* v. *Heart*, 1 *Comstock*, 528; *Cook* v. *Rider*, 16 *Pickering*, 186.)

2. The plaintiff's entry being by color of a deed, his possession extended by construction to the limits of the premises described in his deed. (*Ellicott* v. *Pearl*, 10 *Pet.* 412; *Hammond* v. *Ridgley*, 5 *Har. & J.* 245; *Jackson* v. *Camp*, 1 *Cowen*, 605–9; *Hoey* v. *Furman*, 1 *Penn. State Rep.* 295; *Numerous Cases cited in* 3d vol. *U. S. Digest*, 411, *No.* 177.)

3. The plaintiff's right, being established, continues, without an actual *pedis possessio*, unless a presumption is raised that he has abandoned his claim, and that was a fact to be passed upon by the jury. (1 *White's Rec.* 93, *sec.* 5; 1 *Domat*, 481, *sec.* 24; *Whitney* v. *Wright*, 15 *Wend.* 171; *New York.—Myers* v. *McMillan*, 4 *Dana*, 485; *Kentucky.— Warner* v. *Paige*, 4

Woodworth *v.* Fulton.

*Vermont*, 291 ; *Vermont.—Ellicott* v. *Pearl*, 1 *McLean*, 206 ; *7th Circuit.—Mazyck* v. *Birt*, 2 *Brevard*, 155 ; *South Carolina. —Sanger* v. *Newland*, 9 *Vermont*, 383 ; *Cook* v. *Rider*, 16 *Pickering*, 186 ; *Massachusetts.*)

*R. A. Wilson*, for the defendants, insisted that the judgment of the court below ought to be reversed on the grounds that plaintiff had shown neither title, nor possession of the premises in controversy ; that the proceedings in the court below were a combination of the summary action of possession, and a petitory action upon title, and that plaintiff had failed to make out a case in either form of proceeding.

The paper offered in evidence by plaintiff to establish his title, had none of the characteristics of a title deed, or of a buying and selling contract under the civil law. It is without seal, without subscribing witnesses, without a notarial act of verification, and without consideration, and purports to be a gift by a public officer, by virtue of his office. The question is, whether it was ever intended by the grantor for a title deed, and if so, whether he had a right, by virtue of his office, to make the grant.

Mr. Edwin Bryant, addressed by the title of " Alcalde," but holding a commission from the commander of the American invading army, of chief magistrate and justice of the district of San Francisco, was not a municipal officer of the incorporated town, (*Pueblo*,) of Yerba Buena, if there ever was such an incorporation. He was but a civil lieutenant of the commanding general, whose duties were limited necessarily to the preservation of order and the maintenance of authority over a conquered village ; possessing from necessity the right to determine personal actions, that arose from time to time, during the continuance of the military occupation, and 'until such time as the magistracy and laws of the conquered party should be reinstated, or the territory annexed to the dominions of the conqueror by a treaty. (*Vattel, p.* 395, *sec.* 212.) During this military occupancy, neither the commanding general, nor any of his lieutenants, had the right to make a grant of lands, either out of the

public domain, or out of the lands of individuals or *pueblos.* Nor did the United States at that time possess a sufficient property in the lands of the conquered territory to give a valid title. (*Vattel, p.* 391, *sec.* 202, *p.* 386, *sec.* 197.) From these premises the inference is irresistible that Mr. Bryant had no authority by the law of nations to make the grant, and he manifestly had no such authority by the laws of his own country.

The next exception taken in the court below was that the plaintiff was an officer in the naval service of the United States. It was his duty to preserve, as far as lay in his power, the conquests of his country. For doing this he was paid. In attempting to acquire an individual property in this land, he violated principles of discipline, and principles of law as old as the civil law itself. (*Ayliffe's Pandects, p.* 287; *Vattel, p.* 365, *sec.* 164, 165.)

But it may be said that in these military agricultural establishments, or colonies known as *pueblos,* the fee of the whole land is in the society itself; and that after a new colonist has paid his initiation fee of six dollars and two *reales,* he is entitled to have assigned to him a house lot, which only operating as a permit to take possession of a vacant lot, the possessor acquires an indefeasible interest therein, in consequence of complying with all the requirements of the law, in making improvements; that the town council having dispensed with the condition imposed by the law, and plaintiff having taken formal possession of the lot, and exercised acts of ownership over it, the objection taken to his citizenship, residence, and to the title in the United States, is cured by the treaty of acquisition, and by the subsequent residence of plaintiff.

But this by no means removes the difficulty. An act which is in violation of discipline in a soldier, is to be treated with the same disfavor by the courts, when it is brought before them, as an act which is against good morals in a citizen. For the peace of society is as deeply involved in the preservation of the one as in the maintenance of the other. And if any doubts exist in relation to this claim of plaintiff, they must be most strongly construed against the man, who avails himself of his position in

Woodworth *v.* Fulton.

the army or navy to acquire rights reserved solely for persons in a civil state. The resolution of the town council setting aside the law of the land, is almost too absurd to deserve a grave consideration. This council, it appears from page 378, of President Taylor's California message and documents, was established under a permit or charter from an American colonel of dragoons, and this council was composed of citizens of the conquering nation, whose residence in the town depended on the protection of the invading army. But, if this council had been the lawful Mexican *ayuntamiento*, it could not have dispensed with the conditions of building a house and making a fence around the lot, within a year. This was a general law, to which all *pueblos* were subjected in making grants; and these *ayuntamientos* in the distribution of house lots, and of out-lying lots, were but the almoners of the supreme government of Mexico, in the dispensing of a public charity. The *ayuntamientos*, clearly, could not alter the conditions of the trust imposed upon them by the Mexican government. Hence, plaintiff having neglected for a period of two years to improve his lot, he was deemed in law to have renounced his grant, and the proper municipal magistrate might grant it to another. (*Colonization Law, art.* 23, *White, vol.* 1, *p.* 591.) So that Justice Colton, in making a grant of the lot to Atwill, the grantor of defendants, was performing a duty imposed upon him by the law. (*See letter of instructions of Prefect to Don Pablo Guerrero, J. P. of* 1839 : *of the same to the same of* 1841 : *of the same to the same of* 1842 : *in Book B. of Spanish Records of San Francisco.*) So that on the question of title, the law is clearly on the side of the defendants; and I may say further that when, by the law of the supreme government of Mexico of the 23d March 1837, *ayuntamientos* and alcaldes were abolished in all the villages of California, except the capital, and their powers vested in a justice of the peace, appointed by the Prefect of the district, (*Riley's Digest, p.* 13, *sec.* 5, *art.* 1,) the attempt to organize a town council, without legislative authority, at any time after the formal surrender of franchises and powers to *Guerrero, J. P.*

is clearly a usurpation, and all acts and doings of such a body are utterly null and void.

But, considering this suit as one of plenary possession, plaintiff must fail, for he has not shown that defendants gained possession by force, or fraud, or any clandestine means. (*Institutes Lib.* 4; *Title,* 15, *sec.* 4; *Ayliffe's Pandects,* 338, 339, 341; *Domat, vol.* 1, *p.* 472, *sec.* 13.)

This summary action is allowed at common law only in cases where actual force has been used in ejecting the former occupant. But under the civil law the grounds for this action are much more enlarged, and a party is entitled to this action who has been ejected from his possession by force, or fraud, or clandestine means, or even precariously, viz. : having entered under the plaintiff. And also preliminary to a petitory action, a trial of this kind is allowed for the purpose of determining which party shall hold the possession of the land during the pendency of a suit on title. But on neither of these grounds can this action be maintained. Defendants having purchased at a public auction for a full cash consideration an unoccupied lot, lying in a wild state, they inclosed the same with a fence and were proceeding to erect a house thereon, when they were served with process in this suit. There was no evidence going to show that defendants had any knowledge of plaintiff's claim. Nor were there any marks on the lot, calculated to bring home to defendants a knowledge that the lot was claimed by any other person. There were survey stakes at the corners of the 100 *vara* lot, of which the premises in controversy were a part, but whether these stakes were originally placed there by the town surveyor, or by plaintiff, or by the grantor of defendants, does not appear. Plaintiff therefore did not lose the possession by force, or fraud, or any clandestine means, nor could he treat this as a preliminary action, as his pretended title is the foundation of his suit. And claiming the lot by a former naked possession, (his deed being a nullity,) he cannot eject defendants. (*Recopilacion, vol.* 1, *p.* 94, *sec.* 7, *p.* 347, *sec.* 20, *vol.* 2, *p.* 85; *Ayliffe's Pandects, p.* 399.)

With the argument of expediency I will conclude. It has

Woodworth *v.* Fulton.

been said, that if this court reverses this judgment the titles to property, now valued at millions of dollars, will be overturned, and violence may be the result. But what has this court to do with questions of expediency? By the law and by the testimony alone are questions to be determined in this court, and to the law and to the testimony only can I appeal in presenting this cause. But if I were to present questions of expediency to a court, I should say that this is one of those cases, which calls loudly for the interposition of the court to relieve the city of San Francisco from one of the most intolerable burthens ever borne by any city in the civilized world. Persons connected with the army, or who came with the army, have seized upon all the valuable lands in the city, under one shallow pretence or another, in violation of every principle of the code of laws under which they claim, and have imposed a contribution in the shape of ground rent upon all the business and industry of the city. By the power and influence that the combination of great wealth in few hands gives to its possessors, inferior courts have been over-awed, and now the same system of threats and intimidation has been resorted to, to compel this court to affirm the judgment of the court below. But if this judgment shall be affirmed, then may any man, who, during the last fifteen years, chanced to take out a grant, look up his parchment, and demand to be put into possession of one or more of the finest buildings in the city. And how many dormant grants the affirmance of this judgment will bring into being, no man can tell; and from the facilities now enjoyed for manufacturing and ante-dating grants, it is hard to determine what the end will be, if this court should once depart from the track, which the law has pointed out. And if such loose and equivocal acts of possession are to disturb the occupants of lands and tenements years afterwards, then may occupants of lots in town tremble for their possessions, for they know not at what hour a returning Mexican may come, and insist that where a building stands at present he once pitched his tent, and exercised acts of ownership.

*By the Court*, BENNETT, J. The action is brought to recover possession of a lot of land in San Francisco. At the commencement of the suit the defendants were in the actual possession of the premises, having entered without force, fraud, or any clandestine means, and claiming to be *bona fide* occupants of the same under a written conveyance to them. When they took possession there were no visible signs that the lot had ever been improved, or cultivated, or occupied by any one. Some survey stakes had been driven at the corners of the large one hundred *vara* tract of which the lot in question is a subdivision, and some brush had been cut thereon, apparently for the use of tents in the vicinity. The land, in fact, was in a wild state. The defendants had the subdivision lot, which they occupy, surveyed, and have made valuable improvements upon it.

In June, 1848, the plaintiff claiming to be the owner of the one hundred *vara* lot, went upon it " to take possession," drove some stakes at the corners, and cleared away the brush for a dwelling on some portion of it, but what portion does not appear. There are no other acts, either at that time or since, showing possession on his part. It appears, however, that there was once, but at what period is not shown, a fence extending along the south side of Market-street, from the one hundred *vara* lot lying next westerly of the one claimed by the plaintiff, as far as the bay on the east, and that there were several cross fences extending from that fence southerly. When, or by whom, either of these fences was built does not appear ; but there is not the slightest reason to suppose that the plaintiff, or those under whom he claims, had any thing to do with the construction of either of them. Before the entry of the defendants, all these fences had been destroyed, for the purpose, as is supposed, of supplying people who lived in tents in the neighborhood, with fuel. The above is the substance of the facts necessarily deducible from the testimony.

The claim of the plaintiff is based upon two grounds : First, that he has a perfect title to the lot ; and, secondly, that he was once in possession of it.

To maintain his first position he relies solely upon a grant

Woodworth *v.* Fulton.

from an alcalde of San Francisco, bearing date the 15th day of April, 1847. This grant was made by an American alcalde, not appointed by, nor holding office under, the authority of the Mexican government, to a citizen of the United States, during the continuance of the war between the United States and Mexico, whilst California was in the temporary occupation of the American forces, and before the title of the United States to the country had become complete. In other words, an inferior local officer, holding his place under the authority of a hostile army, while in the occupation of a portion of conquered territory, assumes the right and the power to dispose of the real estate of the vanquished to a citizen of the victorious country. The question is, whether he has such right or power? If he has, whence does he derive it? It must proceed from one of two sources; either from the Mexican government, or from the American government.

The bare statement of the fact, that he was not appointed by, nor held his office under, the authority of the Mexican Republic, but was an alien enemy acting in defiance of her sovereignty, is sufficient proof that, however strictly he may, in making the grant, have observed the formalities of Mexican law, he could have derived from that nation, neither right nor power to transfer the title to any portion of individual or public property. Had California, at the treaty of peace, been restored to Mexico, no man can entertain the idea, that the Mexican government, or the Mexican judiciary, proceeding upon their own municipal law, or upon the principles of international justice, would have regarded such a conveyance otherwise than as of no value or effect. The alcalde could, then, have derived no such power from the Mexican government.

Neither was he invested with any such authority by the American government, either mediately or immediately, directly or remotely. Conceding that he was an officer of the United States, there was yet no legislation by Congress, no action of the President or of either of the departments, not even a proclamation of commodore or general, which has come under my observation, which attempted to clothe him with the power of

disposing of the national domain of Mexico, or the private property of individuals or communities. There being, then, no special and express authority from the government of the United States, such authority must be deduced, if at all, from the law of nations, which, as it is a part of the laws of all civilized countries, forms also a branch of American jurisprudence.

By international law private rights are unaffected by conquest. (*Wheaton's International Law*, 396, *Part* 4, *chap.* 2, *sec.* 5.) The conqueror seizes on the possessions of the state, the public property, while private individuals are permitted to retain theirs. (*Vattel, Book* 3, *chap.* 13, *sec.* 200.) Nor can it make any difference whether the property belonged to a natural person, or to an artificial person. Vested rights in real estate have been respected by all civilized nations ever since the time of the conquest of England by William of Normandy. (*Wheaton*, 396, *ubi supra.*) It is claimed that San Francisco, as the lawful successor of Yerba Buena, was what is termed in Spanish law, a *pueblo ;* and that being such, there was in some undefined manner, and under some vague system of things, vested in the people of the *pueblo,* or in the alcalde, or justice of the peace, or *ayuntamiento,* as representatives of the *pobladores,* an absolute title to a large tract of land, the limits of which have never, as yet, been ascertained farther than the city surveyor has been directed to run the lines of city lots. Whence or how that title was acquired, was not attempted to be explained on the argument ; and I am not aware of any legislation, general or special, of Spain or Mexico, which vested the *pueblo* of Yerba Buena, or the town or city of San Francisco, with the title to a foot of land within their assumed boundaries. If, however, I am mistaken in this, and there was such vested title, the alcalde, an alien enemy of Mexico, and without authority from the American government, had no power or right to interfere with that vested estate.

There is also another difficulty in the plaintiff's case, in making out the power of the alcalde of San Francisco to grant lands, by virtue of his office ; that is, it does not appear that San Francisco or Yerba Buena, was ever constituted a *pueblo,* or had

Woodworth *v.* Fulton.

the rights of one; a fact, which, I think, should be established by proof, and of which courts cannot, and ought not to, take judicial notice; and, further, even admitting that it was a *pueblo*, there is still nothing in this case showing the boundaries of the *pueblo*, or that the lot in controversy lies within those boundaries.

Upon the ground, then, that the lot in question had, previous to the occupation of the country by the Americans, been severed from the mass of the public lands of the country, there is nothing to uphold the right of the alcalde to dispose of it.

I am, however, of the opinion that, even though San Francisco had become a *pueblo* previous to the conquest, and had been invested with all the rights incident to such character, the lands within its limits still continued a portion of the public domain. The full and absolute title of the nation to lands within the limits of *pueblos*, other than such as were, in limited quantities, expressly granted to the *pueblo* for the purpose of defraying certain expenses incidental to the administration of the local government, does not seem, in any case, so far as I have been able to ascertain, to have been divested or in the least impaired. It is true that to certain officers was committed the authority of parcelling out *pueblo* lands, subject to specific rules and restrictions imposed by law; but such officers appear to have acted rather as almoners of the supreme government in dispensing its bounty, than as agents of the *pueblos* in disposing of property, the title to which they held as municipal bodies. The United States, by the conquest of California, acquired an inchoate and imperfect title to all of the national domain of Mexico situated in that territory, which title was perfected by the treaty of peace. ( *Wheaton's International Law, pp.* 208, 396, 440, *ed.* 1846.; *Vattel,* 386.) The title of the United States relates back to the time of the occupation of the country; and, consequently, all laws of Mexico concerning the disposition of public lands must have ceased the moment California was effectually subdued and occupied by the American forces; and neither Mexican nor American officers had any power, under the previously existing laws, or under any laws of the United States, to grant,

sell, or in any way dispose of any portion of the national domain, which had thus been transferred from the sovereignty of Mexico to the sovereignty of the United States.

For the above reasons I think the title of the plaintiff of no validity. The Alcalde having no power to convey—it appearing on the face of the papers that he made the deed by color of his office—and the plaintiff being chargeable with knowledge of these facts, his title is not even colorable. (*Suñol* v. *Hepburn*, *ante, p.* 254.)

The remaining question for consideration relates to the possession of the plaintiff. It does not distinctly appear at what time the defendants entered upon the lot in controversy; but the case must be controlled by Mexican law, and I am of the opinion that it comes within the principle of *Suñol* v. *Hepburn*, decided at this term, and that the plaintiff cannot maintain a possessory action. The question to which I shall briefly advert, is whether ejectment can be maintained under the principles of the common law.

The defendant entered peaceably and quietly upon land which bore no marks of being in the occupation of any one. He entered with a claim of title under a written conveyance. He did not intrude upon the known possession of another by force, fraud, artifice, or by any secret or clandestine means; for aught that appears he took possession in perfect good faith. Under these circumstances, he may justly claim all the privileges, which, in an action of ejectment, are conceded to a defendant in actual possession. Mr. Chitty, in a note to *Blackstone's Commentaries,* (*vol.* 2, *p.* 196, *note* 1,) thus sums up the principles by which this form of action is governed:—" In general a " person in *actual possession* of real property cannot be ousted " unless the party claiming can establish some well founded " title, for it is a general rule, governing in all actions of eject- " ment, (the proper proceeding to recover possession of an " estate,) that the plaintiff must recover on the strength of his " own title, and of course he cannot in general found his claim " upon the insufficiency of the defendant's. For possession " gives the defendant a right against every person who cannot

Woodworth *v.* Fulton.

" show a sufficient title, and the party who would change the
" possession must therefore establish a perfect title; and this
" rule it is said prevails even where a stranger who has no
" color of title, should evict a person who has been in possession
" short of twenty years, but who has not a strict legal title;
" but according to *Allan* v. *Rivington,* (2 *Saund.* 111, *a.* and 6
" *Taunt.* 548, *n,*) a prior occupancy is a sufficient title against
" a wrongdoer; but it is observed in a note to the first case,
" *that this is contrary to the general use,* and it is suggested
" that there is a mistake in terms." This is a succinct state-
ment of the established principles of law applicable to the
action of ejectment, and it appears from this and from the ad-
judicated cases cited by him, to be at the least doubtful,
whether, at common law, an action of ejectment can, in any
case, be supported upon the sole ground of prior possession,
where such possession has not been continued for twenty years,
nor been invaded by force or surprise. There are however
some cases in American reports, which apparently seem to
sanction such a doctrine. Such are the cases of *Jackson ex dem.*
*Murray & Brown* v. *Hazen,* 2 *J. R.* 22; *Jackson ex dem.*
*Murray et al.* v. *Dean,* 5 *Cow. Rep.* 200; *Smith* v. *Lorillard,*
10 *J. R.* 338; and *Jackson ex dem. Duncan* v. *Harder,* 4 *J. R.*
203. Whether these cases are, in truth, a departure from the
common law rules of ejectment, it is difficult to say, owing to
the meagre statement of facts embraced in the reports of them;
and so far as the case at bar is concerned, it is a matter of no
especial moment, for they assume as an established fact the very
point here controverted, that is, the *prior possession.* It may
however be remarked, that if they can be sustained upon any
common law principle, it must be upon the ground that, posses-
sion being *prima facie* evidence of title, and there being no
other evidence rebutting such *prima facie* evidence, the law
will presume that one, who has been in the actual possession of
premises, was the legal owner. But this is a mere presumption,
which may be disproved by the defendant; why then should
the plaintiff be permitted to recover, when he himself, by his
own proof, rebuts this legal presumption? Thus in the case

before us, had the plaintiff, at the trial, proved himself to have been in the actual possession of the lot in question, the law would presume him to have been the owner; but when he adduces his title, which entirely overcomes the legal presumption of ownership, it is questionable whether on the common law principles of ejectment, he is entitled to recover. The defendant in ejectment may prove title out of the plaintiff—he may show it in himself or in a stranger, and thus bar the plaintiff's recovery; and it would be a little strange, if a fact, which, set up by the defendant, would avoid a recovery, should, when brought forward by the plaintiff, establish his cause of action. It is hardly probable that the common law ever tolerated such an absurdity.

But it is, perhaps, unnecessary to have considered this branch of the case at such length; for the fact, upon which the cases above cited from Johnson proceeded, is wanting in this case. The plaintiff never was in the actual possession of this lot. Some cases have gone great lengths in holding slight acts to be sufficient evidence of possession; but I know of no case, which has gone so far as to sanction the position contended for by the plaintiff. When the plaintiff seeks to recover upon the sole ground of prior possession, a clear and unequivocal possession should be proved. (*Jackson ex dem. Ludlow* v. *Myers*, 3 *J. R.* 387.) In *Jackson* v. *Schoonmaker*, (2 *J. R.* 230,) it was held that a possession fence, made by felling trees and lapping them one upon another round the land, was insufficient to support an adverse possession. "This mode of taking possession," says KENT, Ch. J., in that case, " is too loose and equivocal. There " must be a real and substantial inclosure, an actual occu- " pancy, a *possessio pedis*, which is *definite, positive and noto- " rious*, to constitute an adverse possession, when that is the " only defense, and is to countervail a legal title." If that was an insufficient possession to sustain a defense of adverse possession, much more would it have been insufficient to sustain an action, and in that case the facts to constitute possession were at least as strong as they are in the present case. The case of *Jackson* v. *Schoonmaker*, (4 *J. R.* 390,) is of a similar character

Woodworth v. Fulton.

to the case last cited. In this case also the lapping of trees to form a fence for the purpose of taking possession was held to be insufficient. In both of the cases last cited, the defendants went upon the land for the purpose of taking possession, and, while upon it, they performed acts much more indicative of the fact of taking and holding possession than were the acts of the plaintiff in this case. I think that his acts were too loose and equivocal to support a claim of possession. There was no real and substantial inclosure, no actual occupancy, no *possessio pedis*, definite, positive and notorious, of which Kent speaks as being necessary to enable a party to make out a title by possession.

It would, indeed, be an unfortunate state of things, if a person in the actual possession of land, having entered without violence and in good faith and under a title, which to say the least is equally good with that under which his adversary claims, could, after having made valuable improvements on the premises, be thrust out of possession upon such loose and indefinite acts as are those upon which the plaintiff relies. Were that so, then indeed would there be no security to the possessions of most of the people of the city of San Francisco. Any man would be liable to be deprived not only of the land which he possesses in good faith, but also of dwelling-houses, stores, buildings, and other substantial improvements, which he may have erected at enormous expense. Nay, the plaintiff himself, if put into possession, would not be secure; for, upon the same ground on which he should recover, the person who built the fence along the line of this lot, might come forward and claim that he also was in possession prior to the plaintiff, and oust him also; and thus, a series of suits brought against persons in possession having no title, by persons out of possession having no title, might be prosecuted and sustained indefinitely, and the whole community thereby set afloat upon a sea of uncertainty, confusion and litigation which would have no bounds. As for myself so far as I legally may, I am determined to protect the actual possessor, until some person can oust him by virtue of superior title. This is reasonable; this is common law; and

it is indispensably necessary that the rule should be applied and enforced in the existing condition of things in this state. My opinion is that the judgment should be reversed with costs.

                                    Ordered accordingly.

HASTINGS, Ch. J. (dissenting.) The respondent who was plaintiff, instituted proceedings before the late court of First Instance, to recover possession of a certain parcel of land situated in the city of San Francisco, being one hundred *varas* square, and known as lot No. 22 upon the map or plan of the city. The respondent avers in his complaint that the defendants unlawfully entered upon, and despoiled him, the plaintiff, of his possession of a portion of said lot, on the 26th day of Feb. A. D. 1850. The respondent represents that prior to, and since, the 15th day of April A. D. 1847, he has been the owner in fee, by a full and absolute title of said lot, and prays to be restored to the possession of that portion of the same of which he has been so despoiled, &c.

The defendants answered, 1st. That plaintiff was not the owner in fee of said premises. 2d. That defendants did not unlawfully enter upon said premises. 3d. That plaintiff is not entitled to possession, nor has plaintiff been despoiled of any part or portion of his possession as is in his complaint alleged. The respondent introduced a deed from the Alcalde of San Francisco, which was executed in answer to a petition representing among other things, that the petitioner was by the proclamation of Commodore R. F. Stockton, a citizen of California, and a resident of the town of San Francisco.

The deed was executed on the 15th day of April A. D. 1847, and signed " Edwin Bryant, chief magistrate." In the deed he is described as the Alcalde of San Francisco, and uses in the grant the usual term of conveyance in a deed transferring the title in fee. The introduction of the deed was followed by proof of the official character of the grantor, and testimony that in June 1848, the plaintiff took possession of and " staked the lot out," and cleared the foundation for the erection of a house.

Woodworth *v.* Fulton.

That also the lot was fenced, in the summer of 1848 in part. The plaintiff also introduced an ordinance of the town council of San Francisco by which it is declared, " that all conditions " in Alcaldes' deeds to lots in San Francisco, are removed and " abrogated, and that no lot of land in said town or its suburbs " shall hereafter be forfeited in consequence of the grantee or " owner failing to fence or build upon the same according to " the conditions heretofore attached to titles or deeds," which ordinance " passed Sept. 28th,1848." The defendants introduced testimony tending to prove that at the time of defendants' entry " there were no marks of the premises ever having been im- " proved or cultivated before defendants commenced their im- " provements." One of the witnesses testifying that " the land " was in a wild state," and " no *marks* on the premises except " the old survey stakes."

The defendants claimed title and a right to possess under a deed executed by one Joseph F. Atwill, in which deed is a re- cital that he derived title " from the justice of the peace G. Q. " Colton, Esq.," by grant bearing date the 21st day of Decem- ber A.D. 1849.

The court rendered a judgment for the plaintiff and awarded a writ of possession.

This case must be disposed of according to the laws in force at the time when the action was commenced, and in passing upon the rights of the parties, it is important to examine the forms of proceedings and the remedies afforded by the Mexican laws, which were imperfectly understood and inefficiently en- forced, not only before, but subsequent to the conquest and ac- quisition of California by the United States. The action, it is argued, is in the nature of ejectment at common law, and that the plaintiff is bound to a compliance with the rules of evidence required to sustain such an action, and must recover, not on the weakness of the defendants' title, but on the strength of his own; and because he has averred in his complaint that he is the owner in fee of the premises, he is compelled to prove such title before he can recover—that having introduced his deed the presumption in favor of title in the plaintiff is waived.

Whether the plaintiff could or could not recover in this form of action at common law, need not here be questioned, as we are to look to the Mexican system of jurisprudence for a definition of the remedy adopted, and the law regulating such proceedings. Until the passage of the act adopting the common law by the legislature, the Spanish law was in force, unless so far as it was repugnant to the Republican institutions of Mexico or had been expressly altered by statute. To that extent it was the law of California, up to the time of the acquisition of the country by the United States. (1 *Alvarez*, 16; 5 *Col. Dec.* 1; 1 *Febrero Mexicano*, 27.) And that acquisition effected no change in the law regulating the rights or relations of individuals. (*Hal. Dig.* 200, 461; *Vattel* 3; 1 *Pet. Rep.* 57, 542; 6 *Pet.* 691; 7 *Pet.* 51; 9 *Pet.* 117; 10 *Pet.* 326; 12 *Pet.* 410.) The plaintiff evidently intended to adopt a speedy and effectual remedy to recover possession of the premises, instituting in substance one of the possessory actions styled interdicts, maintained for the recovery of those things whose ownership had not been determined by a judgment. He did not set up title for the purpose of *acquiring* possession which he had never enjoyed, but the recovery of a possession of which he had been despoiled. The action is therefore not the petitory. (*Juicio petitorio.*) The Spanish law recognizes a broad distinction between suits claiming possession and those claiming property. And when the action is brought to recover the possession, the right to the possession must be determined before the right to the property. (*Dic. de Esc.*, " *Juicio petitorio;*" 1 *Febrero Tapia*, 229.)

The interdicts or possessory actions are divided into summary and plenary, calling those plenary which follow the form of an ordinary suit, and summary, those which are decided briefly without observing the usual solemnities and without admitting an appeal, or if admitted, only in the *devolutive* effect. (7 *Febrero Tapia, tit.* 9, *c.* 1.)

The interdicts to acquire, retain, and recover possession (*sec.* 13, *Febrero, above cited*) are of the greatest use and importance. The interdict for the *recovery* of possession being the most

Woodworth v. Fulton.

favored by the law, it being of special importance to society that no person shall be disturbed without just cause in the pos. session which he has. (*sec.* 8, *same reference.*)   If the plaintiff had not the title in fee, but was in possession, his action is in the nature of this favored interdict, and in the plenary, and not summary form of such an action; but if he had the absolute title as averred in the complaint, and not the possession, then he seeks to acquire the possession, and must prove his title before he can recover.   In this case, the grievance complained of is not that plaintiff is the owner in fee, and that defendants refuse possession, but that defendants have *despoiled* the plaintiff of his *possession*, peaceably and previously established in him, and quietly enjoyed until the entry of defendants.   It is immaterial, therefore, whether the plaintiff proved and established a good title or not, as claimed in his complaint.   If he proved the prior peaceable occupancy and the subsequent disturbance and interruption by the defendants (provided such occupancy has been in good faith) he has a right to recover.   There is no evidence of the absolute ownership in the plaintiff.   The source of title seems to be the town or village of San Francisco through an officer who represents himself as the chief magistrate of the district, and who claims the right to alienate such property by virtue of his office.   Whether he possessed such right is not material in the investigation of this case.   Nor is it a matter of any moment in this action, whether the deed which he executed be valid or not.   It is not contended for the respondent that he has the absolute title.   There is nothing in this record which will sustain the averment in the complaint, that he is the absolute owner in fee.   The plaintiff, therefore, if he recover at all, must succeed upon his proof of possession, and it may not be improper here to remark that few if any perfect titles are found in countries ceded to the United States by either France or Spain, when tested by the common law.   They are considered inchoate titles, which, however, will be protected by the courts, the land being in possession of the claimant.

It therefore becomes important to examine the different kinds of possession protected by the law under the Mexican system,

in order to ascertain whether the respondent enjoyed that kind of possession which will be protected against intruders and trespassers.

In the *Diccionario de Escriche,* (*Title "Posesion,"*) "It is "said to be of two kinds, viz., possession in fact, and possession "in fact and by the will; in fact, when one holds a thing with- "out any intention of acquiring it, as bailees, lessees, &c., &c., "but possession in fact and by the will is the holding which a "man has of things corporeal, with the aid of the body and "the understanding. And this possession is divided into na- "tural and civil. Civil possession is that which consists in "holding a thing habitually or mentally, as when one goes out "of his house or estate without any intention to abandon it. "It may also be said that natural possession is holding a thing "with intention to keep it, although we know that it belongs "to another."

" In the same manner it may be said that civil possession is "the holding of a thing with the intention to keep it, believing "that it is one's property, although in reality it is not so, as in "the case of the possessor in good faith. The true possession "is the union of the natural and civil possession which follows "from a just title; that is, a title fit (*apt*) to transfer the pro- "perty." This is the definition of the law when it defines it, "the lawful holding which a man has in things corporeal with "the aid of the body and the understanding." These species of possession are similarly defined in the civil code of Louisi- ana, (516, *chap. 2d of " Possession."*) Under the Spanish law, as in Louisiana, a mere civil possession is sufficient, but the possessor must hold in good faith, and by virtue of title, trans- lative of property. Without these qualities one who holds pro- perty holds it *precariously.* (1 *Febrero Tapia,* 229, 231, 230; *7th, same author,* 32; *Ordenanzas de Tierras y Aguas,* 12, 13, 17, 18.) A possessor in good faith is one who by a just title, as by purchase, &c., has acquired anything of which he believes him- self master, and that he has the right to convey it. (*Esc. Dic.* 541; 1 *Febrero Tapia,* 232.)

The plaintiff therefore to recover must prove, 1st, a *just title;*

Woodworth *v.* Fulton.

not a legal title, but a title from one who believed himself to possess the right to convey.

2d. Possession taken under such title before defendants' entry.

Not only the good faith of the plaintiff's possession depends upon the question of *just* or colorable title, but the extent of his possession; as without a title, or deed, fixing limits, he would be in possession only of so much land as he actually occupied. What is sufficient to constitute colorable claim to title at common law, seems to have been differently decided in the courts, but such a title is clearly defined in the Spanish law : " By title is understood any cause capable of transferring " the dominion, such as donation, sale, &c., &c., of course. But " title need not be complete or perfect, for in that event protec- " tion, by the lapse of time, would be unnecessary. (*Ord. de* " *Tierras y Aguas*, 10, 11 ; 3 *Part. Tit.* 29, *c.* 18; *Esc. Dic.* 542.)

" To enable the party to prescribe good faith, a reasonable " belief that he has a title which will be the cause of vesting " in him the absolute property, seems to be sufficient.

" Title colorable is that which is founded in any appearance " of reason and justice ; that which has the appearance of good " faith, but which is not sufficient of itself alone, to transfer the " property without the aid of possession and presumption." (*Diccionario de Escriche, Title* " *Posesion.*")

Has the respondent then such a sufficient title as to constitute his possession, taken in June, 1848, of the premises in controversy, a possession in good faith, and such as lapse of time will ripen into absolute title in fee? He has a deed executed in the usual form of a deed of conveyance, by a grantor who assumed the right to convey, a right which the respondent found to exist in officers of similar name and jurisdiction in the different *Pueblos* in this country. The grantor did not assume to be the owner himself, but to act for and in behalf of the owners, authorized by the municipal regulations of the town. A municipal government was organized under a town council, and an Alcalde. Lots had been surveyed and were then in the possession and under the control

of the town authorities, and were offered for sale. Whether the title to the lots was in the Mexican government or the people of San Francisco, and what regulations had been made by the Departmental Government of California for the alienation of these lots, the plaintiff was not bound to know.

Instructions from the Departmental Government, or orders and decrees of the governor relative to the disposal of municipal or public lands, are not of the nature of general law. We cannot reasonably doubt that the plaintiff, under all the circumstances with which he was surrounded, believed he had purchased of one having authority to convey. The grantor claimed to be the Alcalde and chief magistrate of the town or district of San Francisco. His deed, upon its face, is an official paper. The officer's authority to convey was generally recognized, and it is not usual, nor to be supposed, that a purchaser will so closely scrutinize the right of an officer to sell and convey property as an official act, as that of a vendor who claims title in himself, and who alone is to be benefited by the sale. In addition to the usual solemnities required to pass title to real estate, an official deed has added to it the apparent sanction of the law. In this the then chief judicial officer of the town, whose duty it was to understand the law, and declare the same, may have assumed an authority which he had no right to exercise. He and the officer from whom he derived his commission may have violated law when they took into their own hands, either municipal or national property, and alienated the same, directly or indirectly, or in any manner.

Yet, though there was no such authority vested in this officer, his conveyances being in the usual form, and fit to transfer a title, an adverse possession under such a deed for the time the law requires will grow into sufficient title to prevail against the true owner, provided the title be not in the government, of which we have no evidence in this case. Such is not only the Spanish and Mexican law, but the French and Louisiana law is the same; and so it may be said is the common law, for it is conceded that a deed from any person, though he have no title, executed in the usual form, is colorable evidence of title at com-

Woodworth *v.* Fulton.

mon law, and good in adverse possession. Even a sheriff's deed, without a seal—an instrument void upon its face—has been holden to be a colorable claim of title sufficient in adverse possession. (*Jackson* v. *Newton*, 18 *Johnson's Rep.* 255 ; *also Northorp* v. *Wright*, 7 *Hill's Rep.* 468–9.)

In the case of *La Frambois* v. *Jackson*, (8 *Cowen*, 589,) in the court of errors, in considering the sufficiency of defective title papers, in adverse possession, as against the true owner, Chancellor Jones says : " These documents may be slender evi- " dence of title ; but the question is whether this documentary " evidence, slender as it is, is not sufficient to give a character " of adverse possession to the occupancy of La Frambois under " it, and to rescue him from the reputation of being a mere " trespasser. It is not necessary to constitute an adverse pos- " session, that it should have commenced under an *effectual deed.* " If the possessor claims under written evidence of title, and " on producing that evidence it proves to be defective, the " character of his possession as adverse is not affected by the " defects of his title. If the entry is under color of title, the " possession will be adverse, however groundless the supposed " title may be. The fact of possession and its character, and " the *quo animo* of the possessor, are the test."

Spencer, senator, in the same case, says, " the authorities be- " fore cited show that it is wholly immaterial whether the title " claimed be rightful or not ; it is sufficient if there be a claim " of some title. The very idea of an adverse possession admits " a hostile rightful title."

Another senator, also with the majority, says, " But it is said " that he was bound to know that a title derived from the " French government was invalid, and that it affords him, there- " fore, no color of title. The effect of this reasoning is to place " a person who enters under a claim of title, which he may in " good faith believe to be a good one, in a worse situation than " one who enters with no title at all. I apprehend a person en- " tering on lands without any title or under defective title, is as " much bound to know that, by the law of the land, he has no " good title, as one who enters under a French grant."

Applying this reasoning to the case at bar, the respondent is not bound to know that the Alcalde had no authority to convey the premises. The maxim that every citizen is presumed to know the law and can take no advantage of his ignorance thereof, does not hold in prescription in the Spanish or adverse possession in the common law. If so, this means of acquiring title would cease to exist in most cases, and the decision of the court in the case of *Jackson* v. *Newton*, before cited, would be erroneous.

The respondent, then, having a title sufficient in prescription, it is only necessary that he should have had the possession, either natural (*actual*) or civil. (*See the cases of Bernard* v. *Shaw,* 9 *M. R.* 79; *Mayfield* v. *Morris,* 10 *L. R.* 442; *McDonough* v. *Childress,* 15 *L. R.* 561.) And such is the Spanish and French law. It will hardly be contended that he had not, at least, the civil possession at the time of defendants' entry. He had entered under claim of title, cleared the ground for the foundation of a house, had stakes at the corners of his premises which were prominent and visible at the time of defendants' entry. The lot had been in part at least enclosed by a fence, and although the respondent was not actually occupying at the time, there is no evidence that he had abandoned his possession. It is said the fences had been destroyed, and the lot appeared in an unoccupied state. So the premises of any possessor may be made to appearance, by trespassing upon and destroying improvements.

A false opinion seems to prevail as to the necessity of an actual enclosure as a fence, in order to acquire possession of lands. I think the law to be, that any improvements or monuments *visible and prominent,* indicate a claim of title or possession, and he who enters on such land has notice thereof, and gains no greater right by his entry than he would acquire if the premises had been enclosed by a fence. Upon the question of the necessity of actual residence on land, or a *pedis possessio,* Judge Story in the case of *Ellicott & Meredith* v. *Pearl,* says, " Nothing can be more clear than that a fence is not indispen- " sable to constitute possession of a tract of land. The erection

Woodworth *v.* Fulton.

" of a fence is nothing more than presumption of an intention
" to assert an ownership and possession over the property. But
" there are many other acts which are equally evincive of such
" an intention of asserting such ownership and possession ; such
" as entering upon land and making improvements thereon, rais-
" ing a crop of corn, felling and selling the trees thereon, and un-
" der color of title. An entry into possession of a tract of land
" under a deed containing specific metes and bounds, gives a
" constructive possession of the whole tract, if not in any ad-
" verse possession ; although there may be no fence or enclosure
" round the ambit of the tract, and an actual residence only on
" a part of it."

The case of *Jackson* v. *Schoonmaker*, (2 *J. R.* 230,) is cited
and relied upon as conclusive against the respondent. It is
only necessary to read one extract from the opinion in that case
to show that if it had not already been overruled it should have
been :—" There must be," say the court, " a substantial enclo-
" sure," and " that a possession fence made by felling trees and
" lapping them one upon another round the land, was insufficient
" to support an adverse possession." But this is an overruled
case. It has been substantially overruled by the New York
courts, who for years since hold a very different doctrine. And
it is sufficient, perhaps, to refer to the case of *Ellicott and Mere-
dith* v. *Pearl*, above cited, in which the supreme court of the
United States utter a very different and contrary decision. And
so in many other cases which may be cited from that court, as
in the case of *Ewing* v. *Burnet*, (11 *Pet.* 52,) in which Mr.
Justice Baldwin, in delivering the opinion of the court, says,
" It is well settled that to constitute an adverse possession
" there need not be a fence, building or other improvement
" made.

" It suffices for this purpose that visible and notorious acts of
" ownership are exercised over the premises in controversy for
" twenty-one years after an entry, under claim and color of
" title." " Neither actual occupation, cultivation or residence
" are necessary to constitute actual possession, when the proper-

" ty is so situated as not to admit of any permanent useful im-
" provement." (*See, also, Watkins* v. *Holman et al.* 16 *Pet.* 54.)

The respondent having, in good faith, purchased and taken
possession, although he may have acquired no valid title, the
defendants having entered as a naked intruder and trespasser
against the true owner or by virtue of a similar right, subse-
quently acquired, I believe at the time of defendants' entry the
respondent had the superior right to the possession of the pre-
mises.

I think, therefore, the judgment of the court below should be
affirmed.