## THE PEOPLE *v.* DIMAS ET AL.

## APPEAL from the District Court of San Juan, Section 1.

### No. 795.—Decided December 21, 1912.

MANGROVE SWAMPS—PUBLIC LANDS—PRIVATE ACQUISITION OF PUBLIC LANDS.—
Whether the mangrove swamps in Porto Rico are considered as State forest
reservations, tide lands, commons or waste lands, it is necessary to conclude
that they are public property and can pass to private ownership only by the
methods clearly established by law.

ID. — PUBLIC LANDS — TREATY OF PARIS — CESSION OF TERRITORY TO UNITED
STATES.—In accordance with article 8 of the Treaty of Paris, with the
statutes, with the opinions of commentators, and by the nature of the land
itself, the mangrove swamps of Porto Rico, being tide lands, were ceded
by the Spanish Crown to the United States. Even had the language of
the Treaty of Paris been less clear such cession would have taken place,
for it is a well-established principle that when a foreign government cedes
territory to the United States waste lands and commons pass to the owner-
ship of the United States.

ID.—FORAKER ACT—RESERVATION OF PUBLIC LANDS—TITLE TO PUBLIC LANDS.—
In accordance with the Foraker Act of April 12, 1900, in connection with the
Act of Congress of the United States of July 1, 1902, authorizing the
President to reserve public lands in Porto Rico for public uses, and with
other laws and proclamations concerning the matter, the title to the parcel
of land in litigation is in the People of Porto Rico unless it is shown that
said title has passed to the defendants by any of the means recognized
by law.

ID.—THIRD PARTIES—RECLAIMED LANDS.—In accordance with the Mortgage Law
the defendants, Calvo and Andrés, have not the character of third parties.
Calvo has not because he was the party who prosecuted the dominion title
proceedings, and Andrés has not because after the institution of the pro-
ceedings he made himself a party defendant in substitution of Calvo and
did not allege such character in time. Furthermore, as it clearly appears
in the registry that the lands in litigation were reclaimed by draining the
mangrove swamps and that Calvo's title was not acquired by the means
established by law for such cases, said defendants cannot plead the character
of third parties.

ID.—TITLE OF OWNERSHIP.—The evidence having been examined, it appears that
defendant Calvo had not acquired a title of ownership to the lands in litiga-
tion from the Spanish Government or obtained the same later from the
American Government.

ID.—STATE FOREST RESERVATIONS.—Mangrove swamps in Porto Rico were con-
sidered as State forest reservations, and in the Forest Regulations, approved
by Royal Decree of April 21, 1876, the procedure for the sale and use of
said lands was established.

ID.—ACQUISITION OF WASTE LANDS—PRESCRIPTION.—In accordance with the
Regulations for the concession of waste lands in Porto Rico of April 17,

1884, the defendant Calvo, even supposing that the lands in litigation may be considered as waste lands, had acquired no title to said property by prescription on September 6, 1897, when he applied to the Spanish Government in accordance with said Regulations.

ID.—PUBLIC LANDS—POSSESSION AS OWNER—JUST TITLE.—The possession of the lands in litigation by defendant Calvo who knew that they were public lands cannot be considered as possession as owner with just title.

PUBLIC LANDS—CESSION OF PUBLIC LANDS TO UNITED STATES—ACQUISITION BY PRESCRIPTION.—Although the public lands ceded by the Spanish Government to the United States could be acquired by prescription under the old laws, prescription cannot be pleaded against the United States if dominion by the possessor had not become effective before the cession was made.

ID.—CHANGE OF SOVEREIGNTY—PRESCRIPTION.—Although the lands ceded to the United States and acquired later by The People of Porto Rico were subject to prescription under the laws formerly in force, if dominion by the possessor had not become effective when the change of sovereignty took place, prescription was interrupted and cannot now be invoked against The People of Porto Rico.

PRESCRIPTION.—Prescription is not a right which has been created or acquired, but a mere expectation, a hope, a realization of which depends upon numerous contingencies.

CESSION OF TERRITORY BY ONE SOVEREIGNTY TO ANOTHER—LAW REGULATING PUBLIC LANDS.—When one sovereignty cedes territory to another the laws of the former authorizing the alienation of public property and the authority of the officers charged with executing the same are absolutely invalidated. The lands ceded by the Spanish nation to the United States must be governed by the laws of the United States and not by those of Spain.

PRESCRIPTION—ACTIONS—EXTINCTION OF ACTION BY PRESCRIPTION.—The conclusion having been reached that from 1898 acquisition by prescription cannot be pleaded against The People of Porto Rico unless the same became effective prior to that date, it is necessary to conclude also that prescription extinguishing an action of The People to recover public lands cannot be sustained.

EJECTMENT—ACTION ARISING FROM NULLITY OF TITLE.—The legal doctrine that when an action of ejectment is brought against persons who are in possession of the property in controversy on the strength of a title which was considered valid it is necessary that the annulment of said title be first sought is applicable only when the action arises from such nullity, but not when the right to recover is independent thereof.

RES JUDICATA—EX PARTE PROCEEDINGS—LITIGIOUS PROCEEDINGS—JUDGMENTS IN DOMINION TITLE PROCEEDINGS.—In order that dominion title proceedings may be converted form an *ex parte* proceeding into a litigious proceeding it is not sufficient that one party raise an objection thereto, but he must put the same in form and file it. Judgments rendered in proceedings for dominion title authorized by the Mortgage Law cannot be pleaded as *res judicata*.

COUNTERCLAIM—REIMBURSEMENT FOR RECLAIMING MANGROVE SWAMPS.—A person who voluntarily expends money in draining mangrove swamps without authority from the Government and without title of ownership to said lands cannot claim reimbursement later through a counterclaim.

The facts are stated in the opinion.

*Mr. Eugenio Benítez Castaño* for appellant, Honorato Andrés.

*Mr. Charles E. Foote, fiscal,* for The People.

MR. JUSTICE DEL TORO delivered the opinion of the court.

This is a civil action in ejectment brought by The People of Porto Rico against José Dimas Riera, Enrique Calvo Ríos, Wenceslao Bosch, and afterwards against Honorato Andrés, who was joined as successor in interest of the rights of Enrique Calvo. The district court rendered judgment sustaining the action as to the portion of the parcel of land once owned by Enrique Calvo and conveyed by him to Honorato Andrés, dismissing it as to the other portions of the same parcel owned by the other defendants, José Dimas Riera and Wenceslao Bosch. It is from that judgment that the present appeal has been taken by Honorato Andrés.

In the complaint filed by The People of Porto Rico the following facts are alleged:

"First. That the ownership and full dominion rights over the following property is in The People of Porto Rico, to wit:

"'A parcel of land situated in *barrio* Puerta de Tierra, containing 12,090 square meters, bounded on the North for a distance of 82 meters by a part of lot No. 120 and lots Nos. 121, 122, 123, and 124 belonging to Andrés Calvo y Hermida which lie south of the track of The American Railroad Company of Porto Rico; on the South by the swamps bordering the narrows known as San Antonio; on the East for a distance of 240 meters by San Andrés Street, and on the West for a distance of 55 meters by a lot owned by Marcos Caneja, or the prolongation of lot No. 119 of the lower section of Puerta de Tierra.'

"Second. On October 8, 1906, Enrique Y. Calvo Ríos instituted dominion proceedings in the District Court of San Juan claiming the ownership of the property described by purchase from Andrés Calvo Hermida and María F. Ríos, who acquired it by reclaiming it from the swamps of which it had formed a part and who had possessed it since 1883. After hearing the evidence offered by the plaintiff the court decreed that the title of Enrique Calvo Ríos to the property was established, which title is found recorded in the

Registry of Property of San Juan on folio 116 of volume 69 of San Juan, property No. 2857. And from the first entry made in the aforesaid volume and page of the said Registry of Property of San Juan, Section 1, it appears that, as a matter of fact, Enrique Calvo had instituted proceedings in the District Court of San Juan to assert his title to that property which he had acquired from Andrés Calvo Hermida and María Felícita Ríos, who acquired it by reclaiming it from the swamps of which it had formed a part, and who had been in possession thereof from 1883 or 1885 and had it planted in grass.

"Third. Subsequently, 40 per cent of the total acreage of the property was conveyed by Enrique Calvo Ríos to Mariano Pesquera Goenaga who sold 17 per cent thereof to Wenceslao Bosch and 7 per cent of the entire property to Martín Belber. Later, Belber, Pesquera, Goenaga, and Calvo Ríos sold to Dimas Riera their shares in the property, described in the following manner: Belber, 7 per cent of the entire property which he had purchased from Pesquera; Pesquera, 16 per cent of the property he still owned, and Calvo Ríos, one-half of his share or 30 per cent of the total of the said property, the final outcome being that those owning the property at present to the prejudice of the plaintiff are the three defendants in the following proportion: José Dimas Riera, 53 per cent; Enrique Calvo, 30 per cent; and Wenceslao Bosch, 17 per cent."

The defendants Riera, Bosch and Calvo demurred to the complaint on the ground that it did not allege facts sufficient to constitute a cause of action and the District Court of San Juan, presided over at that time by Judge Martin E. Gill. overruled the demurrer in a decision founded on the following grounds:

"The complaint herein shows that in the year 1883 Andrés Calvo Hermida and María F. Ríos reclaimed, or started to reclaim, some swamp lands situated on the borders of the San Juan Bay at the place known as Puerta de Tierra which forms part of the municipality of San Juan.

"In October, 1906, Enrique Calvo Ríos instituted dominion proceedings in the District Court of San Juan which, upon hearing the evidence offered by the plaintiff, declared Enrique Calvo Ríos to have the dominion title to the said property, which title is recorded in the registry of property.

"The question now is to determine the rights of said Enrique Calvo y Ríos.

"It is generally known that such of the public lands of Porto Rico as were not privately owned belonged to the Crown of Spain; that they were later ceded to the Government of the United States and still later to The People of Porto Rico. Supposing now that in Spanish days the title could have been lost to the Crown of Spain by prescription it is clear that the period of prescription had not expired prior to the adoption of the Political Code of 1902.

"It seems also that in 1902 neither Calvo Ríos nor his predecessors in interest had complied with the legal requirements under which in Spanish days private individuals could secure a dominion title to government property.

"The judicial order issued by the military government and cited herein by defendants has reference only to those possessing in good faith and with a just title and limits prescription to six years. In the case at bar the good faith of the possession of Calvo Ríos and of his predecessors cannot be denied perhaps, but it cannot be said, either, that in 1902 they had a just title.

"Section 9 of the Political Code of 1902 provides that title to public or Insular lands cannot be acquired by prescription.

"It follows then that by the adoption of the Political Code the period of prescription was interrupted when only 19 of the 20 years required by the Spanish law had elapsed.

"Later, as already stated, Calvo Ríos commenced dominion proceedings and the opinion of the court is that under such dominion proceedings no valid title can be granted against the Government, at least in so far as public lands are concerned.

"Therefore, the demurrer of the defendant, Enrique Calvo Ríos, is overruled.

"The complaint shows that after obtaining a dominion title Enrique Calvo Ríos conveyed some portions of the property to the other two defendants, José Dimas Riera and Wenceslao Bosch.

"These two defendants allege through their attorneys that not only do they have the same rights as Calvo Ríos had, but that they have even superior rights owing to their being innocent third parties.

"The second allegation in the complaint is not clear, but the opinion of the court is that when these two defendants purchased their portions of the property they knew, or should have known, from the books of the registry of property that in 1883 the property be-

longed to the Government. In other words, they had legal knowledge that the property had been acquired from public lands reclaimed from swamps by the predecessors in interest of Enrique Calvo Ríos.

"Therefore, if the court is not mistaken in its interpretation of the allegations of the complaint, the two defendants, Riera and Bosch, are on an equal footing with the other defendant, Calvo Ríos.

"In support of the demurrer the allegation has been made that the provisions of the Mortgage Law relating to the rights of innocent third parties are as enforceable against the Government as they are against private individuals. With this the opinion of the court agrees to a certain extent. There can be no question that if A sells a lot to the Government for the erection of a school house, the deed of sale should be given the same construction and should have the same effect as if A had sold the lot to the individual B. But since public lands are involved it cannot be said that the provisions of the Mortgage Law confer the same rights upon the individual A in opposition to the Government as they do to the individual A as against the individual B.

"The decisions of the Supreme Court in *Antuñano* v. *The Registrar of Property of San Juan,* 1 Castro, 407, and *Cobián* v. *The Registrar of Property of Caguas,* 3 Castro, 334, do not seem to apply to public lands.

"Therefore the demurrer interposed by the defendants, on the ground that there is no cause of action, is overruled with costs against all the defendants.

"The defendants are given 20 days, counting from this date, to file their answer to the complaint."

We have transcribed the opinion of Judge Gill because it outlines the fundamental questions involved in this controversy in clear, simple, and concise terms, excepting such questions as came up afterwards during the progress of the case and which we will duly consider at the proper time.

The defendants, Riera and Bosch, answered the complaint through their counsel, Bosch & Soto, defendant Calvo doing likewise through his counsel, Damián Monserrat. Both answers are dated in July, 1910. While the case was at this stage Honorato Andrés García appeared on December 22, 1910, and filed a motion to be joined as defendant, which motion reads as follows:

"Now comes Honorato Andrés García by his counsel, Eugenio Benítez Castaño, and moves the court that he be permitted to become a party defendant to these proceedings, and alleges:

"That subsequently to the filing of this complaint the petitioner acquired by purchase from Enrique Calvo Ríos, as per deed executed before Notary Eugenio Benítez Castaño in this city on September 27, 1910, the entire undivided interest which said Calvo had in the realty which is disputed herein, or 30 per cent of the entire property.

"That by virtue of such acquisition the petitioner has a legitimate and direct interest in the matter disputed herein adverse to the claims made by the plaintiff.

"And, therefore, in accordance with section 63 of the Code of Civil Procedure he prays this court to enter an order directing that he be joined as a party defendant and that his answer to the complaint which accompanies this motion be admitted after service thereof upon The People of Porto Rico."

In his answer the said defendant, Honorato Andrés, made the following allegations, an abstract of which was made by appellant himself in his brief, to wit:

"*As first ground of defense:*

"1. He denied the plaintiff's title, affirming that the full ownership of the property is in the defendants by purchase from its former owner, Enrique Calvo.

"2. He admitted as true the second allegation of the complaint as to the fact that proceedings to obtain dominion title were prosecuted and as to the fact appearing from the first entry in the registry of property.

"3. He admitted the truth of the series of conveyances made by Calvo, but denies that they could have been made prejudicial to The People of Porto Rico, because the defendants had acquired by just title and in good faith.

"*As second ground of defense:*

"1. That the defendants and their predecessors in interest have been in possession of the property as the owners thereof since the year 1881 or prior thereto uninterruptedly, publicly, quietly, and peacefully.

"2. That the possession of the original owner of the property began before 1881 by virtue of a concession or permission given

him by the Spanish Government to reclaim a certain zone of the swamps and convert it into tillable land by his own efforts and at his own expense, and from him the defendants derive their rights. That the said swamp lands are the same tillable lands now in dispute. That in 1883 the Spanish Government issued to the original possessors a certificate establishing the fact that they had completed the work of reclaiming and that a zone measuring over eight thousand meters which they had under cultivation had become their property.

"3. That according to the provisions of section 2 of the Regulations governing the Improvement of Public Lands in the Island of Porto Rico, approved by Royal Decree of April 17, 1884, the absolute dominion of said realty is vested in the defendants by title of prescription.

"*As third ground of defense:*

"1. That the defendants by their possession and that of their predecessors in interest have acquired the full ownership over said realty by prescription, either according to articles 1 and 7 of the Judicial Order of April 4, 1899, or article 1957 of the former Spanish Civil Code which corresponds to section 1840 of the Civil Code now in force.

"*As fourth ground of defense:*

"1. That according to paragraph 1 of section 1864 of the Civil Code now in force plaintiff's cause of action has become extinguished.

"*As fifth ground of defense:*

"1. That owing to the controversy which arose in connection with the dominion title proceedings referred to in the complaint the matter has become *res judicata.*

"*As sixth ground of defense:*

"1. That plaintiff has no title upon which to base an action of ejectment.

"2. That the property in litigation has for a long time been in the uninterrupted and adverse possession and under the ownership of private individuals.

"3. That the present owners of the property are now holding it by virtue of titles the nullity of which is not sought in the complaint, which titles are now in full legal force and effect.

"*Counterclaim:* The defendant Andrés filed a counterclaim alleging: 'That the original owners of the lands, in good faith and with the advice and consent of the Spanish Government, did the work of reclaiming the lands which gave them the value they now

have, and that such work or improvements, in so far as the interest of this defendant is concerned, are worth five thousand dollars.'

"*Prayer:* Having answered the complaint the defendant now prays the court to dismiss the complaint filed by The People of Porto Rico upon all or any of the grounds of defense set up in this answer."

And in his counterclaim this same defendant prayed the court that in case his complaint be sustained The People of Porto Rico be adjudged to pay him the said sum of $5,000.

Based upon such allegations the case went to trial and was submitted for decision.

On June 23, 1911, the attorneys for all the parties made the following stipulation:

"Whereas the aforesaid case has been duly filed and tried before the Hon. Martin E. Gill, judge of said court, and has been submitted for decision to said Judge Gill after all the particulars and questions involved therein had been discussed exhaustively and elaborately, and

"Whereas the matters in controversy in this action not having been passed upon definitely by Judge Gill but left awaiting a final determination;

"Therefore it is hereby stipulated between Luis Llorens Torres, counsel for Honorato Andrés García, and Wenceslao Bosch and Eugenio Benítez Castaño, counsel for the defendants, José Dimas Riera, Enrique Calvo and Wenceslao Bosch, on behalf of the defendants, and Hon. Foster V. Brown, Attorney General of Porto Rico, representing the plaintiff, that the case aforementioned be transferred to the District Court for the Judicial District of San Juan, Porto Rico, Section 1, presided over by the Hon. Félix Córdova Dávila, to whom authority is given to decide and render judgment upon the facts and questions involved therein upon consideration of the record of the case and the briefs filed therein as if it had been brought originally for trial before the said Hon. Félix Córdova Dávila."

On July 12, 1911, the defendant, Honorato Andrés, by his attorney, Eugenio Benítez Castaño, filed the following papers:

"The defendant herein, Honorato Andrés García, by his attorney, Benítez Castaño, leave of the court having been obtained pre-

viously, amends his answer to the complaint filed in this case by adding thereto the following:

"*Seventh ground of defense:*

"The defendant acquired his undivided interest in the property involved herein by purchase from Enrique Calvo Ríos, who according to the registry of property had power to convey the realty, there being no record made in the registry of the complaint filed by The People of Porto Rico, nor any legal reason which could prevent said alienation; and, therefore, the defendant alleges that he is an innocent third party protected by the provisions of article 34 of the Mortgage Law.

"Now comes the defendant, Honorato Andrés, by his attorney, Eugenio Benítez Castaño, and shows:

"That said defendant filed his answer to the complaint on December 22, 1910.

"That from the documentary evidence introduced in this case it clearly appears that on December 30 of the same year, according to a certified statement of the registrar of property of that date, the undivided interest which the defendant has in the property involved herein was encumbered only by a mortgage lien made .in favor of Luis Sánchez Morales, there being nothing in the registry to show that The People of Porto Rico has had its complaint recorded or given any notice which might have served as a warning to a third party in interest.

"That this case is now awaiting the decision of Judge Félix Córdova Dávila, to whom it has been submitted by written stipulation of the parties.

"That the defendant desires to amend his answer to conform to the evidence by adding thereto the allegation set forth in the accompanying paper, and to that effect asks leave of the court to make this amendment with that end in view."

There is a postcript at the foot of the last of said papers, as follows:

"Overruled. Record, Fol. 31/11. Signed. A. Marín, Clerk."

And, finally, on August 2, 1911, Judge Córdova Dávila of the District Court of San Juan rendered the judgment to which we have referred, founded upon an opinion which was made a part of the record.

The foregoing statements enable us to enter upon the consideration and determination of the questions raised in this case with full knowledge of the same. In considering them we will adhere to the following plan: First, we will examine the title of the plaintiff and then that of the defendant, after which we will analyze the issues raised as to the lapse of plaintiff's cause of action by prescription, as to whether or not it was necessary to bring an action for nullity before bringing that of ejectment, as to *res judicata* and, lastly, we will examine the counterclaim filed by the defendant and appellant.

There is no doubt as to the nature of the lands of which the parcel the ownership of which is controverted hereby is composed. That parcel, which is situated in the *barrio* of Puerta de Tierra of the city of San Juan and which at the present time is bounded on the South by the *manglares* (swamps) of the narrows known as San Antonio, was formed by the draining and reclaiming of a section of the swamp.

*Manglar* is a grove of mangrove trees and the mangrove is a tree which grows abundantly along the coasts, keys and swamps of intertropical America. (See Dictionary of the Spanish Royal Academy and Spanish Encyclopedia by Zerolo.)

Mangrove marshes may be made profitable by using the branches and trunks of the trees as firewood or for making charcoal or staves for barrels and hogsheads, by using the bark of certain varieties for dyeing purposes, by using the roots for the construction of houses, and, finally, by draining them and obtaining solid ground generally of great value.

The mangrove marshes in Porto Rico were considered once as forest reservations and whether considered as such, as tide lands or as waste lands or commons, the conclusion necessarily reached is that they were public property and could pass to private ownership only by the processes clearly provided in the statutes.

Therefore, taking into consideration the nature of the

lands which form the parcel in dispute it necessarily follows that the title to said parcel was in the Government. Furthermore, as we shall see hereinafter, Andrés Calvo, the person from whom the defendants derived their rights, in. applying to the Spanish Government for the title to the parcel of land by concession expressly recognized the unquestionable title of the Government.

Under Article VIII of the Treaty of Paris Spain ceded to the United States "all the buildings, wharves, barracks, forts, structures, public highways, and other immovable property which in conformity with law belong to the public domain and as such belong to the Crown of Spain."

Article 339 of the Spanish Civil Code in force at the time the Treaty of Paris was ratified establishes that the following are properties of public ownership: "1. Those destined to the public use, as roads, canals, rivers, torrents, ports, and bridges constructed by the State, and banks, shores, roadsteads, and others of a similar character. 2. Those belonging exclusively to the State," etc.; and the Harbor Laws, also in force at that time, prescribe that "The maritime zone, which is the part of the seashore or coast of the Spanish territory which is washed by the sea in its ebb and flow where the tide is perceptible or which is touched by breakers in stormy weather where the tide is not perceptible," is national property and for public use without prejudice to the rights of private individuals.

The term "public property" is commonly used as a designation of those things which are *publici juris* and that, therefore, are considered as being owned by the public, the State, or the community, and not limited to the ownership of a private person. (32 Cyc., 651.) And the terms "public lands" or "public domain" are used customarily in the United States to designate such lands of the United States or of the States as are subject to sale or other disposition under the general laws and are not preserved or reserved for any special public purpose of the government. There is no statutory definition

of the words "public lands" and their interpretation may vary somewhat in different statutes passed for different purposes, hence they should be given such construction as agrees best with the intention of the Congress in their use. (32 Cyc., 775–776.)

It is evident, then, that according to the terms of the Treaty of Paris, the statutes and the opinion of commentators, and by the very nature of the land itself, the mangrove marshes of Porto Rico or tide lands were ceded by the Spanish Crown to the United States.

And this would be the case still even though the language of the Treaty had been less clear for it is a well-established principle that when a foreign State cedes lands to the United States the waste lands and those having no owners pass to the ownership of the United States.

In the case of *Woodworth* v. *Fulton* the Supreme Court of California used the following language:

"The United States, by the conquest of California, acquired an inchoate and imperfect title to all of the national domain of Mexico situated in that territory, which title was perfected by the treaty of peace. (Wheaton's International Law, pp. 208, 396, 440, ed. 1846; Vattel, 386.) The title of the United States relates back to the time of the occupation of the country; and consequently, all laws of Mexico concerning the disposition of public lands must have ceased the moment California was effectually subdued and occupied by the American forces; and neither Mexico nor American officers had any power, under the previously existing laws, or under any laws of the United States, to grant, sell, or in any way dispose of any portion of the national domain, which had thus been transferred from the sovereignty of Mexico to the sovereignty of the United States." (*Woodworth* v. *Fulton*, 1 Cal., 295, 308.)

On April 12, 1900, the Congress of the United States enacted a law temporarily to provide revenues and a civil government for the Island of Porto Rico, and for other purposes. Section 13 thereof determined the properties acquired by the United States under the Treaty of Paris and placed

under the control of the government established by that act to be administered for the benefit of The People of Porto Rico. Among such properties are included "all the harbor shores, docks, slips, and *reclaimed lands,* but not including harbor areas or navigable waters."

On July 1, 1902, the Congress passed another act authorizing the President to reserve certain public lands and buildings in the Island of Porto Rico for public use, granting other public lands and buildings to the Government of Porto Rico, and for other purposes. In compliance with that act and by various proclamations the President reserved certain lands and buildings among which was not included the portion of reclaimed mangrove land involved in this suit. (Acts of Congress of July 1, 1902, March 4, 1907, and June 14, 1910; President's Proclamations of January 17, 1903, June 26, 1903, June 30, 1903, August 4, 1908, January 26, 1912, and July 13, 1912; Acts of Porto Rico of February 16, 1903, and March 14, 1907.)

Therefore the plaintiff's title to the parcel of land in question has been clearly shown at the outset, and unless it be proven that said title has passed to the defendants by any of the means provided for by law, the grounds of the action are well taken.

The parcel of land taken is described both in the complaint and in the judgment, it was identified at the trial and is in the actual possession of the defendants. As to these facts there is no doubt. The doubts are as to the titles of the defendants.

We have already stated that the complaint was dismissed as to the defendants, Bosch and Riera, the court being of the opinion that they were entitled to the privileges of innocent third parties, as alleged by them, and that it was sustained as to the portion belonging to Calvo and conveyed by him to Andrés, the judgment having been appealed from only as to this last fact.

Were Calvo and Andrés innocent third parties according to the Mortgage Law? Evidently not. Calvo was not because

he was the party who prosecuted the dominion title proceedings hereinbefore referred to, and Andrés was not because he acquired his title from Calvo while the suit was in progress and voluntarily became a party defendant without alleging that he was an innocent third party. When he entered this plea it was too late. As far as he is concerned the case had been tried on the theory that he substituted Calvo as party defendant, assuming all the rights and obligations of the latter. Had he alleged in due time that he was an innocent third party the plaintiff would have been able to prove that he had knowledge of the suit and had acquired the lands with knowledge of the action brought by the plaintiff. Moreover, the fundamental reason for the conclusion reached that the title of the lands in controversy is in The People of Porto Rico—that is to say, that said lands were formed by draining the mangrove marshes, appeared clearly in the registry, and this being so, according to the express provisions of the Mortgage Law the plea of innocent third party would not lie.

Let us see now whether Enrique Calvo did really acquire a valid title and could convey it to the appellant Andrés.

Enrique Calvo applied to the District Court of San Juan and succeeded in securing a dominion title to the parcel of land in controversy which he had recorded in the registry of property on September 25, 1907. If supported by the evidence then introduced this title would be a valid one, otherwise it would not.

Let us examine said evidence. Included in it is a paper adddessed to the Treasurer of the Island by Andrés Calvo dated September 6, 1897, in which Calvo stated that approximately 14 years before, after considerable expenditure of his own money and many pecuniary sacrifices, he had drained a portion of the mangrove marshes in *barrio* Puerta de Tierra and converted them into tillable·land, which land, as proven by an official certificate enclosed, measured 8,470.50 square meters, and petitioned that after the formalities considered necessary by the official whom he was addressing had been

complied with, proper orders be issued vesting in him the title
to said lands by governmental concession, stating that he was
willing to pay in cash the estimated value of said land as this
was the established practice and according to what the Treasury had been doing theretofore.

The certificate referred to in the paper was issued on
November 30, 1883, by José I. Hernández Costa, assistant
superintendent of public works, wherein the statement is made
that at the request of Andrés Calvo he had examined and surveyed a tract of mangrove marsh which Calvo had drained
with his own resources and converted into tillable land and
that it measured 8,470.50 square meters.

Following this certificate is a report signed by Manuel
Villa Arroyo dated September 22, 1897, reciting to the general
superintendent the petition presented by Andrés Calvo and
the statements in the certificate of Hernández Costa and ending with the statement that since the mangrove marshes were
considered as forest reservations his Bureau was of the
opinion that prior to taking final action the assistant chief of
the Bureau of Forest Reservations of the Department should
first be consulted. The following appeared at the foot of the
report: "The Department approves the endorsement made
by the Bureau and leaves the matter in its hands." (Pages
61 and 62 of the transcript.)

There is nothing in the record disclosing what action was
finally taken by the Spanish Government, but it is to be presumed that if any were taken, it did not grant the title to the
property requested, for in 1906 Enrique Calvo, to whom Andrés appears to have sold the lands, commenced the proceedings hereinbefore mentioned for the purpose of securing a
dominion title recordable in the registry of property.

Let us now consider whether it may be concluded that Andrés Calvo acquired the lands in question by prescription.

We have already stated that mangrove marshes were considered in Porto Rico as forest reservations. Title XVII,
Book IV of the Compilation of the Laws of the Indies contain

some provisions relating to forests, which, with slight modifications, were in force (7 Alcubilla, 549,) until the promulgation of the Forest Regulations for the Provinces of Cuba and Porto Rico, approved by Royal Decree of April 21, 1876 (116 Colección Legislativa de España, 359).

Said regulations establish that forests are divided into two classes, to wit, public forests and private forests; public forests being those belonging to the Crown, to townships, etc., and private forests "those of private ownership under a valid title." (Articles 2 and 3.)

Said regulations further provide that the Engineer Inspector of Forests shall prepare for the Governor General of the Province two statistical reports of public forests, one for those which on account of their character should not be sold and another for those which might become the property of private individuals without loss to the public interests; and that the forests included in the second class "could be sold at public auction based upon an appraisement placed upon them by competent officials of the department." (Articles 6 and 10.)

The record (page 67 of the transcript) contains a certified statement relating to proceedings instituted for auctioning concessions for the use of several forest reserves during 1887–88, in which proceedings there are inserted several advertisements of public auctions and among them one which states that the Governor General, at the suggestion of the Inspector of Forests, issued an order instructing the mayoralty to post advertisements in all the *barrios* of the municipal district for public auctions of concessions for cutting firewood during the fiscal year 1887–88 from the government forest reserve known as "Manglar" situated on the northern shore of the bay, and fixing the date for the auction 30 days from the day of posting the advertisements. This procedure conforms to the provisions of Title V of the aforementioned Regulations relating to the "utilization of forest reserves."

Should we examine the answer given to the petition filed

by Andrés Calvo for ·a title by concession to the mangrove marsh reclaimed by him in the light of the regulations governing forest reservations and of the facts set forth in the record of the proceedings for the auctioning of the concessions just mentioned, we would then find the reason for Calvo's failure to secure favorable action by the government, because the land he had reclaimed was part of a public forest reserve.

Let us examine the case in relation to the Regulations governing concessions to waste lands in Porto Rico dated April 17, 1884, whose provisions seem to have been invoked by Andrés Calvo judging by the language used by him in his petition for a title of ownership to the tract of land measuring 8,470 square meters.

Said regulations according to a statement made in the official communication of the Minister for the Colonies submitting them to the approval of the King were made with the view of suppressing one of the causes which kept the growth of agricultural pursuits in Porto Rico from reaching the high degree of prosperity of which it was susceptible, namely, that it was caused by the uncertain condition in which a large portion of the land remained, due to the inaction of those to whom land grants had been made by the Superior Board Controlling Grants of Waste Lands created in 1818 and abolished in 1876, which resulted in a very unfavorable situation for Porto Rican agriculture.   (132 Colección Legislativa de España, 329.)

Article 1 of said regulations provides that

"All such waste lands, soils and grounds as have no legitimate private owner, or in other words, such as have never been conveyed to private individuals by gratuitous concession or by grant for a valuable consideration made by the competent officials, shall be considered as waste lands for the purposes of these regulations and according to Law XIV, Title XII, Book IV, of the Compilation of Indies."

And article 2 says:

"Persons who prove that they have acquired lands by royal grant, by concession from the Superior Board Controlling Grants of Waste Lands, or by title from a competent official, and that they have complied with the requirements which the concessions imposed upon them, shall be considered as owners for the purposes of these regulations irrespective of the time they have been in possession.

"Those who have no title but prove that they have been in uninterrupted possession of said lands for 20 years where the lands are under cultivation, and for 30 years where they are uncultivated, shall also be considered as owners.

"In order that lands be considered as under cultivation it is necessary to prove that they have been tilled during the last three years."

Admitting that the lands involved in this suit can be considered as waste lands, let us see whether Andrés Calvo had acquired his title when he addressed himself to the Government under the special law governing the matter.

It is evident that he had no concession from the Superior Board of Waste land Grants. Let us see whether he had acquired any rights by prescription.

The possession of Andrés Calvo, according to his own petition and according to the conclusion reached by the trial judge after weighing the evidence introduced at the trial, dates from the year 1883, and it is very clear that from that date until September 6, 1897, the 20 years required by the Regulations in order to acquire title to lands under cultivation and still less the 30 years fixed by them for uncultivated lands had not yet expired. Hence it is necessary to conclude that according to the regulations invoked Andrés Calvo at that time had not acquired any right of ownership to the lands by prescription.

And if we consider the case with regard to the general provisions of law governing prescription, it cannot be concluded accordingly that the defendants could have acquired a title by prescription.

Prescription passing title is defined by Escriche as the means whereby one may acquire or become the owner of anything on account of having been in possession thereof during

the entire period predetermined by law, and says, further, that in order that prescription may be effective the following five requisites, speaking generally, are necessary: 1. Just title; 2, good faith; 3, continued possession; 4, lapse of the period fixed by law; 5, the property must be subject to prescription. (4 Escriche, 639.) These are the principles which inspired the ancient laws as well as the Spanish Civil Code, the Revised Code, and the Judicial Order of April 4, 1899.

Calvo knew that the lands he was reclaiming were public lands and the most that may be conceded in his favor is that he was doing so in the hope that some day the Government would give him a title to them. It cannot, then, be concluded that Calvo was in possession as owner and with just title to the lands in question. He himself stated in writing in 1897 that he was willing to pay in cash whatever value might be placed upon the land. One does not have to pay anything for lands to which one has full property rights.

Therefore, whether this case falls within the provisions of Forest Regulations, the Regulations for the Concession of Waste Lands, or whether the general provisions concerning prescription are applicable thereto, it must necessarily be concluded that Andrés Calvo never acquired a valid title to the reclaimed land nor, consequently, could he have conveyed it to Enrique Calvo; hence the judgment of the District Court of San Juan rendered in 1906 in favor of Enrique Calvo is of no legal value.

It should also be observed that all the evidence bearing upon the ancient possession by Andrés Calvo relates to a tract of land measuring 8,470 meters there being nothing clearly and precisely stated as to when the remaining number of meters to make up the 12,090 meters proven in the dominion title proceedings were reclaimed. The difference in area which amounts to over 3,500 meters must have been reclaimed subsequently to 1883.

In determining the rights of the defendant in this case with reference to the question of prescription we can only

take into consideration such facts as have transpired up to 1898 when the Spanish sovereignty of this Island ceased and the American sovereignty commenced. After this date it was not possible to acquire the lands referred to in this suit by prescription. With regard to this point the trial judge expressed himself as follows:

"According to the maxim *nullum tempus ocurrit regi,* the invariable rule of the English law, no title to Crown lands could be acquired by adverse possession. This rule has undergone later some changes by statute. The English doctrine prevails in the United States where, as in England, no title by adverse possession can be acquired against the sovereign. By the application of this principle the only manner in which titles to land owned by the Government can be acquired is under an act of the Congress directly making the grant or authorizing it to be made by some officer. In this case, even though the land ceded to the United States could be acquired by prescription under the former laws, nevertheless if the ownership was not complete before the territory was ceded, prescription cannot be alleged against the United States. (See Cyc., vol. 1, pp. 1111 and 1112.)

"The same principle applies in favor of the States of the Union. In the absence of a provision authorizing the prescription of lands belonging to the States no title by adverse possession can be acquired.

"Even if the Legislature of the Island had remained silent, the right of ownership of The People over lands belonging to them would not prescribe now under the application of the rule obtaining in the States. The Legislative Assembly, however, has enacted this principle in the Political Code, section 9 of which clearly and categorically states that title to Insular waste lands cannot be acquired by adverse possession.

"By the application of this principle, even if the lands ceded to the United States and acquired subsequently by The People of Porto Rico should be subject to prescription under the laws formerly in force, nevertheless, if at the time of the change of sovereignty the right of ownership had not been vested in the possessor, the prescription was thus interrupted and cannot now be asserted against the plaintiff.

"Prescription, as Manresa rightly says in his Commentaries on the Spanish Civil Code, is not a right which has been created or acquired, but a mere expectation, a hope, a compliance with or reali-

zation of which depends upon a multitude of events; and not being an acquired right its realization cannot be deemed subject to the legislation which governed formerly and by the force of which the said right or the legal act from which it originated or to which it owed its existence, it would have been perfected.

"By virtue of the change of sovereignty consummated when the Treaty of Peace was signed a radical change took place in the political laws of this Island and all the laws of political origin as well as those dependent upon. the will of the Crown such as those governing the conveyance and management of public property were entirely revoked *ipso facto.*

"It is a doctrine firmly established that when a sovereignty cedes any territory to another the laws of the former authorizing the alienation of any portions· of the public domain and the authority of officers charged with that power are completely abolished. *More* v. *Steinbach,* 127 U. S., 70, 81; *Ely's Administrator* v. *United States,* 171 U. S., 220, 230; *United States* v. *Vallejo,* 1 Black, 541; *Harcourt* v. *Gaillard,* 12 Wheat, 523.

"In accordance with this doctrine the lands ceded by Spain to the United States should be governed and regulated by the laws of this Island and not by the laws of the nation which ceded them." Opinion of the trial judge, Hon. Córdova Dávila, pp. 36, 37, and 38 of the transcript.

But in this case an attempt is made to maintain that even though prescription passing the title does not exist prescription extinguishing the action of the plaintiff should be held to exist. In 1898 Calvo had not acquired the lands in question by prescription nor even applied in his favor the law most favorable to his interest, namely, the regulations governing the acquisition of waste lands. Consequently, neither had the action which the Government clearly had to recover the ownership of the parcel of land in possession of Calvo become extinguished at that time. Prescription ceased to run in 1898 and to pretend that the provisions of the Political Code and the doctrines so clearly established by jurisprudence have reference only to prescription passing title would be equivalent to rendering such provisions and principles of no legal value. It would be like saying at the same time that one cannot acquire and that one can acquire by prescription from the

government, and inasmuch as that would be arriving at an absurd conclusion it is evident that the law cannot be given such a construction. See *Remy* v. *Municipality*, 2 L. R. A., 148, where a similar proposition is treated at length.

Let us see whether or not it was necessary for The People of Porto Rico to apply for and obtain the nullity of the judgment giving a dominion title to Enrique Calvo prior to bringing the action of ejectment which it has brought. In our judgment it was not because the action brought by the plaintiff in this case did not originate from the nullity of the defendant's title and is both prior to and independent of such title.

The legal principle that when an action of ejectment is brought against persons in possession of the thing in controversy on the strength of a title which was thought to be valid, it is necessary that the nullity of this title be first asked for, is applicable only when the action arises from such nullity, but not when the right to bring an action of ejectment is independent thereof. (Opinions of the Supreme Court of Spain of October 16, 1873, January 17, 1889, April 6, 1889, and February 13, 1892.)

Let us now examine the question of *res judicata*. When the dominion proceedings were pending in the district court the Commodore of the United States Navy in charge of the San Juan Naval Station appeared through the District Attorney of the United States and alleged that the lands the title to which was attempted to be proven belonged to the United States and prayed the court either to hold that it had no jurisdiction to try the case or to grant an extension of time for him to file an objection. The court held that it had jurisdiction and granted the extension requested. There is no record that the Commodore formally filed his objection and the proceedings were disposed of, as has already been stated, decreeing Enrique Calvo a dominion title.

The appellant alleges that owing to the fact that the dominion title proceeding was converted from an *ex parte* pro-

ceeding into a litigious proceeding the final decision rendered therein may be pleaded as *res judicata* as against the disputed rights of the parties herein. In our judgment this allegation is not well founded; 1. Because a real defense on the part of the United States to the dominion title proceedings was not made; 2, because the party defending (if defense were really made) was not The People of Porto Rico; and, 3, because judgments rendered in proceedings for dominion titles instituted in accordance with the Mortgage Law cannot be pleaded as *res judicata.*

The Supreme Court of Spain has held that it was an error for a trial court to have failed to approve a possessory title proceeding in which the district attorney had defended on behalf of the government although his defense was not made in accordance with the law; thus establishing the doctrine that in order that an objection may be considered and decided it is not sufficient to allege such objection, but that it is necessary that it be filed and supported in accordance with the law. The nature of the proceedings does not change where the objection is not made in the manner last mentioned. (51 Civil Jurisprudence, 346.)

Let us now consider the counterclaim. The appellant alleges that Calvo invested large sums in reclaiming the mangrove marshes and that the improvements made by Calvo in the portion which the appellant claims as his own amount to $5,000, and the appellant further alleges that in case the complaint should be sustained then the plaintiff should be adjudged to pay him the sum of $5,000.

At first sight and without going into a lengthy discussion of the matter the conclusion is reached that the counterclaim is absolutely unfounded.

The acts performed by Calvo in reclaiming the mangrove marshes were voluntary and there is nothing to show that they had been authorized by the Spanish Government. On

the contrary, everything leads to the belief that those re-claimed lands formed part of the Government forest reserve. The proper course for Enrique Calvo to have pursued was not the institution of a proceeding to prove his dominion title which, as a matter of fact, he had not fully acquired by any of the means recognized by law, but he should have addressed himself to the new Sovereign setting forth the equity of his case, assuming that he had acted in good faith, and praying this authority to do what the former Sovereign had failed to do.

For the foregoing reasons the appeal should be dismissed and the part of that judgment appealed from, affirmed.

*Affirmed.*

Chief Justice Hernández and Justice MacLeary concurred.

Mr. Justice Wolf dissented.

Mr. Justice Aldrey did not take part in the decision of this case.